1   **WO**

2

3

4

5

6           IN THE UNITED STATES DISTRICT COURT

7               FOR THE DISTRICT OF ARIZONA

8

9   Armando Coronado, et al.,                  )    CV 07-1089-PHX-SMM
                                               )
10              Plaintiffs,                     )    **MEMORANDUM OF DECISION AND**
                                               )    **ORDER**
11  v.                                         )
                                               )
12  Janet K. Napolitano, Governor, et al.,      )
                                               )
13              Defendants.                     )
                                               )
14  _____ )

15

16          Currently before the Court is Defendants' Motion to Dismiss the First Amended

17  Complaint (Dkt. 62), which challenges Plaintiffs' claims that Arizona's constitutional and

18  statutory schemes governing a convicted felon's right to vote are unconstitutional.  Also

19  before the Court is Plaintiffs' Response to Defendants' Motion to Dismiss the First Amended

20  Complaint (Dkt. 67) and Defendants' Reply in Support of State Defendants' Motion to

21  Dismiss Plaintiffs' First Amended Complaint.  (Dkt. 71).

                        **BACKGROUND**
22
            On June 1, 2007, Plaintiffs filed the original complaint in this action.  (Dkt. 1).  The
23
    Complaint alleged that Arizona's disenfranchisement laws violate provisions of the United
24
    States of America and State of Arizona constitutions.  The first four claims challenged
25
    Arizona's disenfranchisement laws precluding  restoration of a felon's right to vote until
26
    completion of the entire sentence, including payment of fines and restitution, as
27
    unconstitutional.  (Id. at ¶¶ 56-71).  The remaining three claims challenged the
28

1   disenfranchisement of all convicted felons by attempting to draw a distinction between

2   common law and non-common law crimes.  (Id. at ¶¶ 72-83).  Contending that Plaintiff's

3   Complaint failed to state a claim for which relief could be granted, Defendants filed a Motion

4   to Dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

5   (Dkt. 22).

6         The Court granted Defendants' Motion to Dismiss the Complaint without prejudice

7   on January 22, 2008 (Dkt. 48), reasoning that Arizona law treats all felons equally with

8   regard to disenfranchisement and subsequent restoration of civil rights and finding no

9   distinction between common law and non-common law felonies.  (Id. at 6, 14).  On April 30,

10  2008, Plaintiffs filed the First Amended Complaint (Dkt. 59) and on May 19, 2008,

11  Defendants filed their Motion to Dismiss the First Amended Complaint.  (Dkt. 62).  Plaintiffs

12  subsequently filed a Response to Defendants' Motion to Dismiss the First Amended

13  Complaint on June 17, 2008.  (Dkt. 67).  Defendants then filed a Reply in Support of State

14  Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint.  (Dkt. 71).

15        The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a), and

16  42 U.S.C. §§ 1971(d), 1983.  The Court may exercise supplemental jurisdiction under 28

17  U.S.C. § 1367(a).  Venue is proper in this district under 28 U.S.C. § 1391(b)(1).

18                        **STANDARD OF REVIEW**

19        To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6),

20  "factual allegations must be enough to raise a right to relief about the speculative level on the

21  assumption that all of the complaint's allegations are true (even if doubtful in fact)."  Bell

22  Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965 __ U.S. __ (2007).  When deciding such

23  a motion to dismiss, all allegations of material fact in the complaint  are taken as true and

24  construed in the light most favorable to the plaintiff.  W. Mining Council v. Watt, 643 F.2d

25  618, 624 (9th Cir. 1981).

26        A court may dismiss a claim either because it lacks a "cognizable legal theory" or

27  because it fails to allege sufficient facts to support a cognizable legal claim.  SmileCare

28  Dental Group v. Delta Dental Plan of Cal., Inc., 88 F.3d 780, 783 (9th Cir. 1996) (quoting

1
2
3
4
5
6
7

Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 534 (9th Cir. 1984).  "Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment." Polich v. Burlington, N., Inc., 942 F.2d 1467, 1472 (9th Cir. 1991).  When exercising its discretion to deny leave to amend, "a court must be guided by the underlying purpose of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or technicalities."  United States v. Webb, 655 F.2d 977, 979 (9th Cir. 1981).

**DISCUSSION**

8
9
10
11
12
13
14
15
16
17
18
19
20
21

In their First Amended Complaint, Plaintiffs add four substantive allegations relating to their original claims which impact Counts One and Five of their First Amended Complaint.[1]  Under Count One, Plaintiffs first argue that Arizona's requirement that people with felony convictions pay all of their legal financial obligations ("LFOs") before they can have their right to vote restored "negatively and disproportionately impacts indigent people in violation of the equal protection clause." (Dkt. 59 at ¶ 63).[2]  Second, Plaintiffs assert that "[g]iven the racial disparities within the federal and state criminal justice systems, Arizona's felon disenfranchisement scheme results in minorities being denied the right to vote at much greater rates than whites." (Id. at ¶ 46).  Under Count Five, Plaintiffs assert that the number of individuals who have criminal convictions has increased to a significant degree since the Fourteenth Amendment was passed.  (Id. at ¶ 45).  Additionally, Plaintiffs claim that Arizona's admission to the Union required that it disenfranchise only those individuals convicted of common law felonies.  (Id. at ¶ 78).

22
23
24
25

[1] Plaintiffs' remaining substantive claims in the First Amended Complaint are virtually identical to claims made in the Original Complaint.  Thus, the Court dismisses these claims, Counts 2, 3, 4, 6, and 7, for reasons stated in the original dismissal order. (Dkt. 48, Order dated January 22, 2008).

26
27
28

[2] Plaintiffs asserted this claim in their Response to Defendants' original motion to dismiss (Dkt. 39 at 18-19) and the Court addressed it in the original dismissal order (Dkt. 48 at 11, Order dated January 22, 2008).  However, the Court did not undertake further inquiry of the matter because the Complaint did not include any allegation of disparate impact.  (Id.).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.   <u>Count One</u>: Fine & Restitution Requirements Violate the Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides in pertinent part that "[n]o State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  The Fourteenth Amendment also provides that "when the right to vote at any election . . . is denied . . . or in any way abridged, *except for participation in rebellion, or other crime*, the basis of representation therein shall be reduced . . ." <u>Id.</u>, § 2 (emphasis added).

In <u>Richardson v. Ramirez</u>, the Supreme Court interpreted this language to mean that states could exclude convicted felons who have completed their sentences from voting without violating the Equal Protection Clause of the Fourteenth Amendment.  418 U.S. 24, 56 (1974).  In other words, under <u>Richardson</u>, states may constitutionally disenfranchise felons and are not required to restore their right to vote.  However, the Supreme Court subsequently articulated one exception to this broad right to disenfranchise felons, namely, that states cannot intentionally discriminate on the basis of race.  See <u>Hunter v. Underwood</u>, 471 U.S. 222, 233 (1985) (finding the enactment of the Alabama Constitution's disenfranchisement provision "was motivated by a desire to discriminate against blacks on account of race . . . [a]s such, it violates equal protection").   The Arizona Constitution provides that "[n]o person who is adjudicated an incapacitated person shall be qualified to vote at any election, *nor shall any person convicted of treason or felony*, be qualified to vote at any election unless restored to civil rights." Ariz. Const. art. VII, § 2(c) (emphasis added).

### A.   Indigent People

Plaintiffs argue first, that Arizona's scheme of restoring Plaintiffs' right to vote only after they pay LFOs negatively and disproportionately impacts indigent people in violation of the equal protection clause.  (Dkt. 59 at ¶ 63).  Plaintiffs assert that they are entitled to "engage in discovery to support their claim that Arizona's LFO requirement is

- 4 -

1 unconstitutional because it has a negative and disparate impact on indigent people and to
2 rebut the State's purported interests in enforcing the LFO requirement." (Dkt. 67 at 6).

3 Plaintiffs' claim is insufficient for two reasons.  First, Plaintiffs fail to allege that they
4 are indigent and thus, they do not have standing to bring a claim challenging a law based on
5 its alleged disparate impact on indigent persons.  Warth v. Seldin, 422 U.S. 490, 498-99
6 (1975) (finding that "the essence of the standing question is whether the plaintiff has 'alleged
7 such a personal stake in the outcome of the controversy' as to warrant his invocation of
8 federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf"
9 (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)).  Even if Plaintiffs had alleged they are
10 indigent, indigent persons are not a protected, or suspect, class for purposes of equal
11 protection: "poverty, standing alone[,] is not a suspect classification." Harris v. McRae, 448
12 U.S. 297, 323 (1980).  The Supreme Court has "never held that financial need alone
13 identifies a suspect class for purposes of equal protection analysis." Maher v. Roe, 432 U.S.
14 464, 471 (1977).  Furthermore, Plaintiffs do not challenge their sentences, which require
15 them to pay the LFOs that are the subject of their claim.  The requirement that felons pay all
16 fines and restitution as mandated by their sentence applies to all convicted felons equally.
17 Plaintiffs do not allege that Arizona discriminates against indigent persons in the way it takes
18 away or restores felony voting rights.

19 Additionally, in its original dismissal order, this Court held that fines and restitution
20 are rationally related to the state's interest in "punishing and deterring criminal activity."
21 (Dkt. 48, Order dated January 22, 2008).  Consequently, not only can the State permanently
22 disenfranchise convicted felons under Richardson, it has a legitimate interest in enforcing the
23 LFO requirement prior to restoring a convicted felon's right to vote.  The State applies the
24 felon disenfranchisement laws equally to all individuals, indigent or not.  Thus, the LFO
25 requirement is constitutional, and Plaintiffs have failed to state a claim upon which relief can
26 be granted.

27 Similarly, Plaintiffs are not entitled to engage in discovery to rebut Arizona's interests
28 in enforcing the LFO requirement because the United States and Arizona Constitutions

1  expressly permit felon disenfranchisement.  Richardson, 418 U.S. at 56.  If a state chooses

2  to restore a felon's right to vote, it can consider a previous criminal record in determining

3  voter qualifications: "[r]esidence requirements, age, *previous criminal record* . . . are *obvious*

4  *examples* indicating factors which a State may take into consideration in determining the

5  qualifications of voters."  Richardson, 418 U.S. at 53 (quoting Lassiter v. Northampton

6  County Bd. of Elections, 360 U.S. 45, 51 (1959)) (emphasis added).

7      Additionally, the exclusion of felons from the vote has an affirmative sanction in

8  section 2 of the Fourteenth Amendment:

9      We hold that the understanding of those who adopted the Fourteenth
       Amendment, as reflected in the express language of section 2 and in the
10     historical and judicial interpretation of the Amendment's applicability to state
       laws disenfranchising felons, is of controlling significance in distinguishing
11     such laws from those other state limitations on the franchise which have been
       held invalid under the Equal Protection Clause.

12  Id. at 54.  In other words, felon disenfranchisement on its face will not be held invalid under

13  the Equal Protection Clause.  The "purported" State interest that the Plaintiffs seek to rebut

14  is legitimate and was recognized as such by this Court.[3]   Thus, Plaintiffs' claims fail, and

15  they are not entitled to engage in discovery to rebut the State's interest in enforcing the LFO

16  requirement.

17      **B.    Racial Disparities**

18      Plaintiffs also allege that racial disparities exist in federal and state criminal justice

19  systems (Dkt. 59 at ¶ 46), but do not allege any discrimination caused by Arizona's

20  disenfranchisement laws.  The argument that racial disparities exist in the justice system is

21  unrelated to Plaintiffs' claim arguing against paying their sentencing fines and restitution

22  prior to having their right to vote restored.  Plaintiffs did not challenge their sentences as the

23  products of racial disparities when they were imposed.  Existing racial disparities in the

24  criminal justice system are not directly related to felon reenfranchisement, which occurs after

25

26      [3] "In this case, the fine provisions serve the interests in punishing and deterring criminal

27  activity." (Dkt. 48 at 7, Order dated January 22, 2008) (citing Polykoff v. Collins, 816 F.2d 1326,
    1337 (9th Cir. 1987)).  "Including these financial obligations in a convicted felon's sentence is

28  rationally related to these legitimate governmental interests."  (Id.).

1    a felon has completed his sentence.  Thus, Count One does not include any claims for which

2    relief can be granted.

3        In addition, Plaintiffs allege that the LFO requirement results in minorities being

4    denied the right to vote at greater rates than whites. (Id.).  Similar to the first claim, Plaintiffs

5    have not alleged that they are racial minorities, and thus lack standing to bring the claim.  See

6    discussion supra at 5.  However, even if Plaintiffs had alleged that they are racial minorities

7    and had shown that Arizona's felon disenfranchisement laws disproportionately deny the

8    right to vote to racial minorities, "[d]isproportionate *impact* is not irrelevant, but it is not the

9    sole touchstone of an invidious racial discrimination forbidden by the Constitution."

10   Washington v. Davis, 426 U.S. 229, 242 (1976) (emphasis added) (finding that "we have not

11   held that a law, neutral on its face and serving ends otherwise within the power of

12   government to pursue, is invalid under the Equal Protection Clause simply because it may

13   affect a greater proportion of one race than of another").  In other words, "official action will

14   not be held unconstitutional solely because it results in a racially disproportionate impact .

15   . . [p]roof of *racially discriminatory intent or purpose* is required to show a violation of the

16   Equal Protection Clause."  Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S.

17   252, 264-65 (1977) (emphasis added).  Thus, under Davis and Arlington Heights, Plaintiffs

18   must allege that Arizona lawmakers purposefully intended to discriminate against racial

19   minorities when enacting or implementing the felon disenfranchisement laws and the First

20   Amended Complaint fails to contain this required affirmative allegation.    Therefore,

21   Plaintiffs' claim fails.

22       A district court must be "particularly cautious about dismissing discrimination claims

23   simply for a failure to allege [certain] facts."  Greenier v. Pace, Local No. 1188, 201

24   F.Supp.2d 172, 182 (D. Me. 2002) (reasoning that it "often proves difficult to state facts

25   tending to show a defendant's state of mind before any discovery has taken place").

26   However, unlike Greenier which involved an employment discrimination case that turned on

27   facts available only to the opposing party, the case at hand involves facts of Arizona

28

1
2
3

lawmakers' intent in enacting the felon disenfranchisement provision. This information can be readily obtained through standard legal research methods and is largely contained in the public records of the State of Arizona.

4
5

**II.    Count Five: Plaintiffs Claim that Disenfranchising Persons Convicted of Non-Common Law Felonies Violates the Equal Protection Clause**

6
7
8
9
10
11
12
13

Plaintiffs also assert that the number of individuals who have criminal convictions has increased to a significant degree since the Fourteenth Amendment was passed. (Dkt. 59 at ¶ 45). However, this statement asserts no claim for which relief can be granted. Given the significant increase in the U.S. population since the enactment of the Fourteenth Amendment, it is not surprising that the number of convicted felons has increased. Plaintiffs fail to allege a correlation between Arizona's felon disenfranchisement laws and a general increase in the number of criminal convictions.    Specifically, Plaintiffs fail to show how this statistic indicates that they have been injured.

14
15
16
17
18
19
20
21

Plaintiffs further argue that "[g]iven the racial disparities within the federal and state criminal justice systems, Arizona's felon disenfranchisement scheme results in minorities being denied the right to vote at much greater rates than whites." (Id. at ¶ 46). Plaintiffs stated that their allegations "regarding racial disparities in the criminal justice system are solely related to Plaintiffs' common law felony claims – not the LFO requirement . . ." (Dkt. 67 at 6). However, Plaintiffs' argument regarding racial disparities in the criminal justice system also fails here for the reasons already stated, namely that racial disparities in the criminal justice system are not directly related to felon reenfranchisement.

22
23
24
25
26

Finally, Plaintiffs alter their original argument that a distinction between common law and non-common law felonies is appropriate[4] by claiming that Arizona's admission to the Union required that it disenfranchise only those individuals convicted of common law felonies. (Dkt. 59 at ¶ 78). In their response, Plaintiffs provide no authority, either through

27
28

[4] The Court rejected Plaintiffs' distinction between common law and non-common law felonies in the original dismissal. (Dkt. 48 at 12-14, Order dated January 22, 2008).

1   case law or legislative history, demonstrating that Arizona's admission into the Union was

2   premised upon the notion that it could only disenfranchise those individuals convicted of

3   common law felonies.

4        A search of Arizona legislative history indicates no discussion of an agreement

5   between Congress and Arizona lawmakers that Arizona would only be admitted to the Union

6   if it only disenfranchised individuals convicted of common law felonies.  President Taft

7   signed the Enabling Act on June 20, 1910 and authorized the territory of Arizona to "advance

8   toward statehood," meaning that the delegates would need to be elected to draft a state

9   constitution.  John S. Goff, Records of the Arizona Constitutional Convention of 1910 iii

10  (1991).  Fifty-two delegates were elected and the Arizona Constitutional Convention

11  convened on October 10, 1910.  Id.  The delegates discussed suffrage, and records reveal

12  that one delegate, Mr. Winsor, initially proposed an amendment which included the

13  following language pertaining to felony disenfranchisement: "[n]o such person under

14  guardianship, non compos mentis, or insane, shall be qualified to vote at any election, nor

15  any person convicted of treason or felony, shall be qualified to vote at any election unless

16  restored to civil rights."  Mr. Winsor stated:

17
18       "[t]he qualifications for voters are stated negatively, in order that the doors
         may be left open for such other qualifications as the legislature or the
19       lawmaking power may hereafter see fit to provide, and until the lawmaking
         power sees fit to change the qualifications now required of electors they will
20       remain as they are . . . I submit that the only proper and safe course for us to
         pursue is to leave the matter in such form deemed necessary and [it can] fit the
21       qualifications required of electors to the conditions as they may from time to
         time exist.[5]

22  Id. at 871.  Throughout these discussions pertaining to suffrage, there is no mention of a need

23  to distinguish between common law and non-common law felonies.  Thus, Plaintiffs'

24
25
26
        _____

27       [5] Although this amendment was rejected by convention attendees, the discussion indicates
        that there was no discussion of the need to distinguish between common law and non-common law
28      felonies.  See Goff, supra, at 871-75.

argument that Congress conditioned Arizona's admission to the Union on its agreement to disenfranchise felons for common law crimes is unsupported by the legislative history.

Even if Plaintiff's allegation is taken as true, it does nothing to change the Court's original interpretation of the plain language of the Fourteenth Amendment, namely that the phrase "other crime" does not warrant a distinction between common and non-common law crimes. (Dkt. 48 at 12-14, Order dated January 22, 2008).[6] "Where the language is plain and admits of no more than one meaning, the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion." Caminetti v. United States, 242 U.S. 470, 485 (1917). Thus, a distinction between common and non-common law crimes is not warranted as a matter of law.

In the case at hand, Plaintiffs were given the opportunity to amend the original complaint. "In the absence of any apparent or declared reason - such as undue delay, bad faith . . . repeated failure to cure deficiencies by amendments previously allowed . . . futility of amendment, etc. - the leave sought should, as the rules require, be 'freely given.'" Foman v. Davis, 371 U.S. 178, 182 (1962). However, in the First Amended Complaint, Counts 2, 3, 4, 6, and 7 were identical to the original counts dismissed in the original complaint. Thus, these counts are dismissed with prejudice because they were a "repeated failure to cure deficiencies by amendments previously allowed." See id. Similarly, Counts One and Five are dismissed with prejudice because both counts fail as a matter of law to state a claim upon which relief can be granted.

///

///

///

_____

[6] "A plain reading of § 2 admits of no distinction between common law and non-common law felonies. Thus the language of § 2 means what it says – persons convicted of crimes may be excluded from the franchise." (Id. at 13.).

- 10 -

1

**CONCLUSION**

2

Accordingly,

3

**IT IS HEREBY ORDERED GRANTING** Defendants' Motion to Dismiss the

4

First Amended Complaint (Dkt. 62) with prejudice.

5

DATED this 5th day of November, 2008.

6

7

8

_____

9

Stephen M. McNamee
United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 11 -